## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CHABAD JEWISH CENTER OF TOMS RIVER
INC., a New Jersey nonprofit corporation, and
RABBI MOSHE GOURARIE,

                        Plaintiffs,

   vs.

TOWNSHIP OF TOMS RIVER, N.J. and
ZONING BOARD OF ADJUSTMENT OF THE
TOWNSHIP OF TOMS RIVER,

                        Defendants.

Civil No. _____

COMPLAINT

## COMPLAINT

Plaintiffs CHABAD JEWISH CENTER OF TOMS RIVER, INC., a New Jersey nonprofit corporation (the "Chabad"), and RABBI MOSHE GOURARIE (collectively the Chabad and Gourarie shall be referred to as "Plaintiffs"), by and through their attorneys, Kenny, Chase & Costa and Storzer & Greene, P.L.L.C., hereby complain of Defendants TOWNSHIP OF TOMS RIVER, N.J. (the "Township") and BOARD OF ADJUSTMENT OF TOWNSHIP OF TOMS RIVER (the "Board") (collectively, the Township and the Board shall be referred to as "Defendants") as follows:

### NATURE OF ACTION

1.    This action is commenced by Plaintiffs to redress violations of civil rights, as protected by the Free Exercise and Equal Protection Clauses of the United States Constitution, 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C.

§ 2000cc *et seq.* ("RLUIPA"), the Fair Housing Act, 42 U.S.C. § 3604 ("FHA"), and the New Jersey Law Against Discrimination caused by the Defendants' burdensome, discriminatory and unreasonable land use regulations and intentional conduct that have prohibited and continue to prohibit the Plaintiffs from using real property as a clergy residence on an 8.24-acre parcel located at 2001 Church Road, Toms River Township, Ocean County, New Jersey, designated as Block 394, Lot 17 on the Official Tax Map of Toms River Township (the "Property").

2.     Motivated by significant anti-Semitic hostility by Defendants and the local community and directly contrary to state law, the Township and Board have prohibited the Plaintiffs' use of the Property as a clergy residence, which involves the single-family residence of Rabbi Gourarie and his family, small weekly prayer services of 10-15 people, Hebrew study for five children for two hours per week, and sporadic other small religious gatherings. The Chabad's property is located directly adjacent to an American Legion hall, a Christian church, and a large college. The Defendants took such action despite the fact that Township officials have themselves previously admitted that the Plaintiffs' use was permitted, and knowingly permitted such use for twelve years. However, the Defendant Board, knowingly responsive to the hostile local community rejected any such use, regardless of any limitations or conditions that could be placed on such use.

3.     These recent actions to shut down the Chabad took place during a rising tide of anti-Semitism among the Toms River government and population, fearful that the ultra-Orthodox[1] Jewish community located in adjacent Lakewood Township will extend into Toms River. In March 2016 the Township's Mayor, Thomas Kelaher, was recently quoted as describing ultra-

---

[1] "Ultra-Orthodox" Jews belong to a subset of Orthodox Judaism and are identifiable by distinctive attire and rejection of secular culture. Although the Plaintiffs are themselves ultra-Orthodox, the individuals to whom they reach out are nearly all non-Orthodox.

Orthodox Jews moving into Toms River as an "invasion," regarding which he later stated "I have nothing to apologize for. . . .  I don't feel like I did anything wrong."  Further, an Assistant Township Attorney made a following statement regarding an anti-solicitation ordinance designed to prevent ultra-Orthodox Jews from purchasing homes in Toms River, which reads in part: "[D]ealing with this situation is much like a chess game. Every action seems to be countered in one way or another. That is why it requires a collaborative effort between concerned citizens and the governmental apparatus."

4.      Significant evidence of the anti-Semitic hostility of such "concerned citizens," which often was directed at the Chabad's religious use, has frequently appeared online in petitions, on social media and news websites, where statements referred to ultra-Orthodox Jews and/or the Chabad's use as "cockroaches," "trash," a "cult," "he-brews and she-brews," a "Jewish conspiracy," "disgusting phonies," a "joo school," "damn jews," "dirty," and a "disease," among many other negative epithets.  As one Toms River resident stated regarding the Chabad's zoning request, "Keep these damn jews out of Toms River.. There will be issues if this passes... I promise."

5.      In March 2016, the words "Burn the Jews" were scratched into playground equipment at Riverwood Park in Toms River.  Not only did this incident fail to raise outrage in the local community, but most published local comments were more sympathetic to the perpetrators than to the Jewish population.

6.      Moreover, the Township's land use ordinances, which would permit secular occupation activities at the Plaintiffs' property such as "Home occupation" and "Home professional office," and would permit secular gatherings of people at a home for purposes such a book club, treat Plaintiffs' use differently and worse on the basis of religion.

7.      The Board's decision on the Plaintiffs' request for an interpretation also effectively

prohibits the Chabad's use throughout Toms River.

8.     The Chabad, which has been in operation for twelve years in two separate locations with the same land use status and without having any negative impact on the surrounding community, is now faced with the choice between ceasing its religious exercise or facing ongoing significant penalties.

## PARTIES

9.     Plaintiff CHABAD JEWISH CENTER OF TOMS RIVER INC. is a domestic nonprofit corporation formed under the Laws of the State of New Jersey on June 21, 2004.

10.     Plaintiff RABBI MOSHE GOURARIE is the Rabbi and Director of the Chabad.

11.     Defendant TOWNSHIP OF TOMS RIVER, N.J. is a municipal corporation of the State of New Jersey, having offices at 33 Washington Street, Toms River, New Jersey 08753, which, through the governing body, adopted the land use regulations in question in this matter.

12.     Defendant ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF TOMS RIVER is a board of adjustment duly appointed pursuant to  N.J.S.A. 40:55D-69 to consider requests for interpretation of zoning ordinances under New Jersey's Municipal Land Use Law ("MLUL") (N.J.S.A. 40:55D-1, *et seq.*).

## JURISDICTION AND VENUE

13.     The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. § 2000cc *et seq.*, 42 U.S.C. § 3604, and 42 U.S.C. § 1983.  This Court also has supplemental jurisdiction over Counts VIII, IX and X under 28 U.S.C. § 1367(a) for claims brought under New Jersey law.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all of the

events giving rise to the claims herein occurred in this District and the Defendants are subject to personal jurisdiction in this District as of the commencement of this action.

## FACTUAL ALLEGATIONS

<u>Plaintiffs' Religious Exercise</u>

15.     Plaintiff Chabad Jewish Center of Toms River, Inc. was founded for the purpose of operating a clergy residence and Chabad house within Toms River, New Jersey.

16.     The Chabad and Rabbi Gourarie are affiliated with the Chabad-Lubavitch movement.

17.     Chabad-Lubavitch is a major movement within mainstream Jewish tradition with its roots in the Chassidic movement of the 18th century.   The Chabad-Lubavitch branch of Chassidism was founded in 1745. Today, Chabad-Lubavitch operates 3,500 locations in more than 85 countries.

18.     The word "Chabad" is a Hebrew acronym for the three intellectual faculties of *chochmah* -- wisdom, *binah* -- comprehension, and *da'at* -- knowledge.

19.     The word "Lubavitch" is the name of the town in Russia where the movement was based from its inception until the Holocaust. Rabbi Menachem Mendel Schneerson, of blessed memory, is credited with establishing the movement in the United States and nurturing its spread nationally and worldwide.

20.     A part of Chabad-Lubavitch's religious mission is "[t]o create light for the sake of light, just by doing good for the sake of doing good, until all the world is filled with the serene light of G-dly wisdom 'as the waters cover the ocean floor.'"

21.     Chabad-Lubavitch teaches that all Jews, regardless of their Jewish knowledge and practices, contain a divine spark. By welcoming all Jews into centers of Jewish practice and

learning, sometimes known as Chabad houses, Chabad-Lubavitch seeks to repair divisions between observant and non-observant Jews.

22.     Each husband and wife team, the rabbi and rebbetzin, who head a Chabad house are emissaries on behalf of the Chabad-Lubavitch movement to all Jews in the communities they serve, but remain organizationally independent.

23.     Chabad houses generally serve as homes for Chabad-Lubavitch rabbis and their families, and will also host prayer services, other occasional religious events, and Shabbat meals.

24.     The need to establish new Chabad houses in the world wherever Jews live is a core belief of the Chabad-Lubavitch movement.

25.     Members of the Chabad-Lubavitch movement also believe that Chabad houses serve to open the hearts of others and spread Godliness.

26.     Rabbis, such as Rabbi Gourarie, who open their homes as Chabad houses, believe that they are the "heirs of Abraham" who can inspire others to observe Jewish commandments and improve the world.

27.     Chabad is a unique organization, and its motto is love your fellow as yourself. Plaintiffs believe that every single individual has a spark of goodness within them and they, therefore, believe and teach the importance of love and respect for each and every one of G-d Almighty's creations.

28.     Chabad attempts to bring the teachings of Judaism to those who may be interested in learning about it in a nonjudgmental and non-imposing manner to each person at their own pace.

29.     The Plaintiffs have various programs to fulfill their religious mission, including humanitarian programs such as Golden Friendships, Loaves of Love, visitation to hospitals and senior citizen homes, counseling, and teaching Hebrew and Judaism to adults, children and teens.

30.     Many aspects of Jewish religious observance, such as the building of Sukkahs during the Jewish festival of Sukkot within which all meals must be eaten for eight days, the weekly observance of Shabbat including eating the mandatory eating of three meals during the day, the observance of Passover and related dietary laws, are based in the home.

31.     By hosting interested people in the home, Chabad rabbis are able to teach the home-based aspects of Jewish religious observance by example.

32.     A rabbi and his wife operating a Chabad house can also provide the welcoming and comfortable environment necessary to break down barriers, which is central to the Chabad movement.

33.     Further, Jewish religious observance occurs at specified times during the day and evening and, as a result, it would be very difficult for Rabbi Gourarie to replicate the experience of a Chabad house in a separate space.

34.     Thus, it is important to Plaintiffs' religious faith that they are able to engage in such religious exercise, which is very limited in terms of frequency and participants as described below, within their home.

35.     The Chabad is the only Chabad house in Ocean County.

36.     Chabad houses are not usually found in predominantly orthodox Jewish neighborhoods, and they generally engage in outreach to the nonorthodox Jewish community.

37.     Rabbi and Mrs. Gourarie were appointed by Rabbi Baruch Chazanow, regional director of Chabad of Monmouth and Ocean counties to establish a Chabad house in Toms River. They commenced operations in Toms River in 2004 at a rented residential location at 1693 New Hampshire Avenue in Toms River ("1693 New Hampshire").

38.     1693 New Hampshire was a small residential parcel that shares its driveway with an adjacent property.

39.     1693 New Hampshire is located in the "Rural Residential" zoning district.

40.     1693 New Hampshire was a single-family residence where Rabbi Gourarie and his family resided.

41.     1693 New Hampshire was not a "church" under Toms River's zoning ordinances and had no permits to operate as a "church."

42.     A "church" is not permitted by right or as a conditional use in the Rural Residential zoning district.

43.     While the Chabad occupied 1693 New Hampshire, it did not receive any zoning violation notices.

44.     On two occasions, the Chabad was contacted by Bernard Mackle, Toms River zoning officer (hereinafter referred to as "Mackle"), due to neighbor complaints pertaining to gatherings at the 1693 New Hampshire property.

45.     Gourarie informed the Toms River official about the use of the property as a clergy residence and explained about the Chabad's gatherings.

46.     Neither Mackle nor any other Township official ever took any action against Gourarie or the Chabad for violations of any zoning restrictions based on their use of 1693 New Hampshire.

47.     During Mackle's conversations with Rabbi Gourarie, Mackle never stated or otherwise suggested that the Plaintiffs' use was not permitted at the 1693 New Hampshire property.

48.     As Rabbi Gourarie's family grew, he needed a larger home and therefore began

searching for a new clergy residence that would accommodate his family and the Chabad.

## The Property and Its Location and Use

49.     On or about 2011, Rabbi Gourarie identified the subject property located at 2001 Church Road, Toms River, New Jersey (the "Property") as a potential site for the Chabad.

50.     The Chabad purchased the Property in March 2011 for use as a parsonage.

51.     The Property is zoned "R/C-3," the Township's "Conservation Residential Zone" district.

52.     The Property is approximately 8.24 acres in size, and is improved with a single family dwelling that is approximately 5,500 square feet.

53.     The Property is also improved with an attached garage that is approximately 1,400 square feet.

54.     The dwelling is serviced by a long driveway and is set back significantly from Church Road, which is county road and a major artery within Toms River.

55.     The Property is bordered on three sides by nonresidential uses.

56.     Several assembly and institutional land uses are located either directly adjacent or within the immediate vicinity of the Property.

57.     The Property is directly adjacent to the George P. Vanderveer American Legion Post 129.

58.     Upon information and belief, the George P. Vanderveer American Legion Post 129 holds approximately 16-18 events monthly, including bingo nights, support groups, Sunday dinners, and outdoor music events in the summer.

59.     The American Legion makes its hall available for rental.

60.     The Property is directly adjacent to the George P. Vanderveer American Legion

9

Post 129 and the Ocean County College.

61.     The Ocean County College is a public two-year community college with an enrollment for Fall of 2014 of 9,296 students.

62.     The Property is located directly adjacent to Our Lady of Perpetual Help Byzantine Catholic Church, located at 1937 Church Road.

63.     Upon information and belief, Our Lady of Perpetual Help Byzantine Catholic Church also holds bingo night events.

64.     The Property is located close to the Toms River Fire Academy on Church Road, located at 1780 Church Road, which is a fire-training facility, containing an administration building and indoor training area.

65.     The Property is located very close to Insulite, Inc., located at 1890 Church Road, which is a manufacturer of insulating glass.

66.     Across Church Road from the Property is "Holiday City as Silverton," an adult community with a clubhouse.

67.     The only adjacent residential dwellings are located along the long driveway toward the front of the Property.

68.     The Property has a parking area that can accommodate approximately ten vehicles.

69.     Since purchasing the Property in 2011, the Plaintiffs have used it principally as a place of residence for Rabbi Gourarie's family.

70.     Rabbi Gourarie also uses the Property as a home office.

71.     Plaintiffs have also used the Property for small religious gatherings on Saturdays for approximately 10-15 people.

72.     Plaintiffs host dinners at the Property.

73.     Plaintiffs hold larger High Holiday religious services and other holidays or large gatherings (such as Purim or a Bat Mitzvah), off-site at a hotel location.

74.     Plaintiffs have occasionally used the Property to host other small gatherings of, on average, 12 individuals for purposes related to the clergy residence use.

75.     The Plaintiffs occasionally offer classes on various topics within Judaism which attract on average less than ten people.

76.     Rabbi Gourarie's wife also offers weekly Hebrew school classes for five children.

77.     These Hebrew classes occur on Sundays and last about two hours.

78.     Most of the Chabad's religious activities take place in the garage on the Property, which Plaintiffs have used as-is since purchasing the Property (other than putting down a temporary tile floor).

79.     Plaintiffs' use of the Property has not resulted in any negative impacts on the Toms River community.

80.     Any impact of the Plaintiffs' use of the Property on the Toms River community is negligible, compared to that created by surrounding uses.

81.     The Property is an ideal location for the Chabad's land use.

82.     Plaintiffs' use of the Property is the same as their previous use of 1693 New Hampshire.

83.     Plaintiffs do not intend to change the footprint or otherwise alter the size or appearance of the structures on the Property.

84.     Plaintiffs' activities have not grown significantly in the twelve years in which they have been located in Toms River.

The Township's Land Use Regulations

85.     Toms River regulates land use in its jurisdiction in part through Chapter 348 ("Land Use and Development Regulations") of the Code of the Township of Toms River (the "Code").

86.     Section 348-5.2 of the Code states that "[n]o use shall be considered a permitted use or a conditional use in a zone district unless included as such in the particular zone district."

87.     The Code does not include a "clergy residence" or "parsonage" as a permitted or conditional use in any zone district.

88.     A "clergy residence" or "parsonage" is not defined by the Code.

89.     The Code defines "Dwelling" as "Any building or portion thereof designed or used exclusively for one or more dwelling units."

90.     The Code defines "Dwelling Unit" as "A building or part thereof having cooking, sleeping and sanitary facilities designed for or occupied by one family and which is entirely separated from any other dwelling unit in the building by vertical or horizontal floors, and with an independent means of access."

91.     The Code defines "Dwelling, Single-Family" as "A building designed for or containing one dwelling unit."

92.     Rabbi Gourarie's home on the Property is a "Dwelling, Single-Family."

93.     The Code defines a "Church" as "[a] building or group of buildings, including customary accessory buildings, designed or intended for public worship. For the purpose of this chapter, the word 'church' shall include chapels, congregations, cathedrals, temples and other similar designations, as well as parish houses, convents and such accessory uses."

94.     Rabbi Gourarie's home at the Property is not "[a] building or group of buildings, including customary accessory buildings, designed or intended for public worship."

95.     Rabbi Gourarie's home at the Property is not an "accessory use" to any other

"church" "building or group of buildings" on the Property.

96.     The Code defines an "Educational Use" as "Public, parochial or private elementary or secondary schools, duly licensed by the State of New Jersey, attendance at which is sufficient compliance with the compulsory education requirements of the state. Summer day camps shall not be considered as educational uses or accessories to such uses. Duly accredited colleges and universities shall also be considered educational uses."

97.     The Plaintiffs' use is not a "[p]ublic, parochial or private elementary or secondary school[]."

98.     The Plaintiffs' use is not "duly licensed by the State of New Jersey, attendance at which is sufficient compliance with the compulsory education requirement of the state."

99.     The Plaintiffs' use is not a "[d]uly accredited college[] or universit[y] . . . ."

100.     The Plaintiffs' use is not an "Educational Use."

101.     Section 348-10.3(A) of the Code permits the following uses as "Permitted uses" within the R/C-3 zoning district: "Single-family dwellings," "All farm and agriculture activities, including nurseries and livestock and poultry raising, except the keeping or raising of swine," "Public or semipublic parks or open space," "Essential services," "Community residences for the developmentally disabled and community shelters for victims of domestic violence, community residences for persons with head injuries and community residences for the terminally ill, per N.J.S.A. 40:55D-66.1 et seq."

102.     "Public or semipublic parks or open space" and "Community residences for the developmentally disabled and community shelters for victims of domestic violence, community residences for persons with head injuries and community residences for the terminally ill, per N.J.S.A. 40:55D-66.1 et seq." are nonreligious assembly and/or institutional land uses.

103.    The Code treats Plaintiffs' religious use differently and worse than "Public or semipublic parks or open space" and "Community residences for the developmentally disabled and community shelters for victims of domestic violence, community residences for persons with head injuries and community residences for the terminally ill, per N.J.S.A. 40:55D-66.1 et seq."

104.    Section 348-10.3(A) of the Code permitted "public or semipublic educational facilities" as a "permitted use" within the R/C-3 zoning district prior to March 10, 2009.

105.    Ordinance No. 4181-09 removed "public or semipublic educational facilities " as a permitted use within the R/C-3 zoning district.

106.    Upon information and belief, Ordinance No. 4181-09 was enacted to target ultra-Orthodox Jews and prevent religious land uses that would serve ultra-Orthodox Jews.

107.    Section 348-10.3(D) of the Code permits the following uses as "Conditional uses" within the R/C-3 zoning district: "Public utilities," "Home professional office," and "Home occupation."

108.    Section 348-10.3(D) of the Code permitted "churches and places of worship" as a "conditional use" within the R/C-3 zoning district prior to March 10, 2009.

109.    Ordinance 4181-09 also removed "churches and places of worship" as a conditional use within the R/C-3 zoning district.

110.    Upon information and belief, Ordinance 4181-09's removal of "churches and places of worship" within the R/C-3 zoning district was also enacted to target ultra-Orthodox Jews.

111.    Section 348-2.3 of the Code defines a "Home Occupation" as "[a]ny gainful employment, or occupation, of one or more members of the resident family, which shall constitute, either entirely or partly, the means of livelihood of such member or members and which shall be conducted in clearly secondary or accessory use to the primary residential use of the principal

structure. Such occupation may be pursued in the principal dwelling structure or in a secondary building which is accessory to such principal structure. Home occupations may include but are not limited to such activities as dressmaking, millinery, watchmaking, electrical and radio repair and carpentry. The retail sale of goods or services in structures designed or altered to make such activities the primary use of the site shall not be construed hereunder to be a home occupation."

112.    Section 348-9.12 of the Code describes the conditions placed upon a "Home Occupation" use, which state:

     A.    There shall be no more than two employees other than the bona fide residents of the dwelling.

     B.    The portion of the dwelling utilized for the home occupation shall not exceed 50% of the first floor area of the dwelling.

     C.    The occupation shall be conducted entirely within the dwelling or within an accessory building or buildings.

     D.    No sounds shall be audible outside the building.

     E.    The property must front on a street classified as a minor or major collector or minor or principal arterial roadway.

113.    If the Plaintiffs' use were classified as a "Home Occupation," it would meet all of the conditions of section 348-9.12 of the Code.

114.    The Code treats Plaintiffs' religious use differently and worse than "Home Occupations."

115.    Section 348-2.3 of the Code defines a "Home professional office" as "[a]ny professional office conducted entirely within the dwelling or accessory building to the dwelling which is the bona fide residence of the practitioner."

116.    Section 348-9.11 of the Code describes the conditions placed upon a "Home Occupation" use, which state:

A.    Not more than one professional and one professional only, without associates or partners, may utilize the office, except that one additional professional may be permitted, provided that both professionals are members of the same immediate family which includes parent, children and spouses only.

B.    Not more than two persons may be employed as office personnel.

C.    The portion of the dwelling devoted to professional office use shall not exceed 30% of the total floor area of the dwelling.

D.    Minimum lot size requirements.

[Added 12-26-1979 by Ord. No. 1892]

(1)    Interior lot.

(a) Minimum lot width: 90 feet.

(b) Minimum lot area: 12,000 square feet.

(2)    Corner lot.

(a) Minimum lot area: 15,000 square feet.

(3)    In all zones where any of the minimum requirements exceed the minimum requirements as hereinabove provided, the greater requirement shall be observed.

E.    The property must front on a street classified as a minor or major collector or minor or principal arterial roadway.

117.    If the Plaintiffs' use were classified as a "Home professional office," it would meet

16

all of the conditions of section 348-9.11 of the Code.

118.    The Code treats Plaintiffs' religious use differently and worse than "Home professional office."

119.    The Code does not generally prohibit secular gatherings of 10-15 individuals in a single-family residence.

120.    Under the Township's Code, a homeowner could host weekly football parties, book club gatherings, or other groups of people of a size similar to the Chabad's activities on a regular basis without violating its provisions.

121.    The Code treats Plaintiffs' religious use differently and worse than secular gatherings in a person's home.

122.    The Chabad's religious land use is treated on less than equal terms as other nonreligious land uses, as such uses would have similar or greater impacts on the Township's regulatory purpose(s) as the Chabad.

123.    An "accessory use or building" is defined under the Code as: "A subordinate use or building, the purpose of which is incidental to that of a main use or building on the same lot except that any initial structure constructed upon a parcel of land or a building containing living space shall never be considered an 'accessory building.'"  (Emphasis added.)

124.    A "primary or principal use" is defined under the Code as: "The primary or principal purpose for which a building, structure or lot is used."

125.    A "building, principal" is defined under the Code as: "A structure in which is conducted the principal use of the site on which it is situated. In any district, any dwelling shall be deemed to be a principal building on the lot on which it is located."  (Emphasis added.)

126.    Section 348-3.2 of the Code permits the Zoning Board of Adjustment to "[h]ear

17

and decide requests for interpretation of the Zoning Map or Ordinance or for decisions upon other special questions upon which such board is authorized to pass by any Zoning or Official Map Ordinance in accordance with this Act."

<u>Hostility Toward Ultra-Orthodox Jews in Toms River</u>

127.    Significant evidence demonstrates government and community hostility and animus towards ultra-Orthodox Jews in Toms River.  A substantial component of such animus is directed at the ultra-Orthodox Jewish community in adjacent Lakewood Township.

128.    Toms River Mayor Thomas Kelaher was quoted in March 2016 as saying "It's like an invasion," referring to ultra-Orthodox Jews moving into Toms River.

129.    Mayor Kelaher's statement was condemned by the Anti-Defamation League and and Agudath Israel of America.

130.    Mayor Kelaher further stated: "Let's assume that I used that word.  What I was referring to is the sworn testimony of neighbors in the North Dover area, who testified and used that term, that they feel like it's an invasion. That's the context in which I used it. The people who live there think that."  In response to the Mayor's statement, one Toms River resident stated: "Toms River mayor was correct and heard his constituents complaints simply doing and repeating what they told him!"

131.    Campaign materials sent by the Committee to Re-Elect Tom Kelaher Mayor, Carmen Memoli Treasurer have included statements such as

> "While Treasurer of the Lakewood Democrats, **Pontoriero Team Council Candidate Michael Bateman** helped raise tens of thousands of dollars from the **special interests** who helped shape Lakewood into what it has become today. . . . On November 3rd say **NO** to **The Pontoriero/Bateman Democrats Toms Rivers** [sic] **Future depends on it !"**

(Emphasis in original.)

18

132.    On March 1, 2016, the words "Burn the Jews" were carved into playground equipment at Riverwood Park in Toms River.

133.    Concerning that incident, a Toms River police department spokesman stated: "An investigation was opened and we are trying to determine if this graffiti was done by ignorant teenagers or was of a more direct and sinister nature directed at the Jewish faith," suggesting that the statement "Burns the Jews" could be interpreted as anything other than a statement "of sinister nature directed at the Jewish faith."

134.    Comments on local media websites made regarding the "Burn the Jews" incident include:

- "[O]ne of the main things that [the Mayor] is missing here is that Riverwood Park along with all of the other parks in Toms River Township is the for the RESIDENTS OF TOMS RIVER. It is clearly posted on the rules of the park but apparently these rules do not apply to the residents of Lakewood, who do NOT pay taxes in Toms River (nor their own town of Lakewood) but want to use the facilities of those provided by the tax payers. . . .  [T]hose that have voted for him and pay taxes in Toms River protect the parks and recreational areas that we the citizens of Toms River pay for and want to enjoy but can't because they are overrun by people who do not belong in the Township Parks"

- "It's pretty sad, when we New Jersians can't tell the difference between some dumb kids scribbling some misspelled garbage on a kids playset, and an actual hate crime, . . . .  Besides, nine times out of ten these so-called hate crimes are self inflicted. Look up the statistics and see for yourselves."

- "Drive one day in Lakewood around 9 am or Friday afternoon around 2 and you will see why no one wants them in their area!"

- "The Orthodox Jewish extremists are making their way into Manchester Hollyoaks park. Give it 20yrs. And Manchester Twp. Will turn into next Lakewood. The Orthodox tried to pulled some stunt in Jackson a couple of years ago only to have their children in the public park two days out of the week, that didn't fly with the local residents of Jackson Twp. It went to litigation and did not pass. Even the State of Israel has a major problem with them. The bad part of this is the Orthodox go by their own Jewish laws and do not agree with the American laws. Write to your congressman, senators, local officials and complain! How about when summer comes along and your children want to play in the water to cool down, to have a Orthodox man tell your children to cover up their swimwear, because it offends their religion. How about LAKEWOOD build their own park."

- "Probably a local parent at wits end. Did you ever go to Riverwood park, kids from Toms River can't even play there because it's overrun by out of towners."

- "Oh no, who gives a s#¡t? Honestly, who cares? Get over it. It's not threatening at all, what you have is some stupid kids in the 12-16 age group thinking their edginess is hilarious. The fact that they're even making an issue about this is ridiculous. And to top it off, the other comments are right. The TR park is for TR residents. Not Lakewood                                                                                                    ones."

135.   "Closed"   Facebook   groups,   including   "#TomsRiverMatters," "#OceanCountyMatters," and "Town Hall Stop the Sprawl" (which has an aerial view of the Chabad's Property as its cover photo) have been used to coordinate the efforts of the local community opposed to the Chabad's use and the ultra-Orthodox Jewish community in general. Statements published in such Facebook groups describe the motivation of the local community in opposing Plaintiffs' use and ultra-Orthodox Jews from moving into Toms River.  Just a few examples are:

- "They are like cock roaches man all over shop rite I can take the smell in target but not while food shopping"

- "This group was originally for keeping the Chabad off of Church Road."

- "We all know that 'they' are the Hasidic Jewish Community that is exploding in Lakewood. There is nothing racist about the word 'they'."

- "These people are really trash."

- "Anyone who is accused of being antiSemitic can direct any and all accusations to me, I will be more than happy to take that down. Makes me insane, my Jewish friends tell me these people have nothing to do with Judaism, they are cultlike and parasitic, living their lives to simply milk the system."

- "Good news on the home front- the last two houses that I know sold in ND did not sell to, um, uh. Well, they sold to nice folks that LIKE to pay taxes"

- "I am NOT afraid to stand my ground and say "this is a cult" they are religious extremists with ideas of "how can we be 'more religious' or 'WE are the chosen people' ". Since Jesus IS God, God loves us all he still expected tribes to have their own land in the middle east. I read my bible-attend St Andrew UMC (although my opinions are solely mine). As a lifelong United Methodist, I have been a nurse

caring for these people for 25 years, watched them use the guise of faith to manipulate the rules of law, society, and humanity! They DO NOT HAVE THE SAME VALUE FOR HUMAN LIFE AS THE REST OF US. I have personally seen how they deal with accidental death and even negligent homicide as a bystander! They manipulate everything."

● "They crapped up Lakewood now they want to crap up Toms River Resident's say NO Way !!!"

● "That's crazy. I know someone who did sell to their 'kind' if you will... Paid $675,000 cash for her house.":

● "OK Rob so here's an idea how about we get a crew together and start knocking on their doors on the Sabbath to see if they want to sell to us gentiles"

● "We need to find a way to stop this now or all of Ocean County is in trouble."

● "What I'm saying is, it should be difficult for them to establish themselves here not the other way around."

● "And this nonsense is why towns fight the orthodox moving in, why don't they understand?"

● "I'm sure it's fraud on the welfare system but remember this community finds every loophole in our laws they can. I swear those men who go to school their whole lives in Lakewood are just classes to learn how to get away with cheating the system and very little religion."

● "If anyone sees [ultra-Orthodox Jews] sitting in a car looking at houses they should call the police and report suspicious males who appear to be casing out a neighborhood. Say that you are concerned for your safety and that you would like an officer to please come by immediately."

● "This is what is planned for the area bordering Cross St, hence bordering N. Dover. They have run out of room in Williamsburg and Kiryas Joel. . . .  Write to them OFTEN and let them know we do not want to be the next Williamsburg, Kiryas Joel or Monsey."

● "No 'we' have not lost our town. North Dover and Silverton do not comprise all of Toms River. Toms River is 100 square miles as opposed to Lakewood's 25. I'm sure there are a lot of people in Toms River, especially on the southern side of the highway, that haven't a clue nor really care as to what's going on in North Dover and Silverton they are too busy trying to pay their bills and live their lives. The real problem will be down the road, when Keleher decides he can't handle the job anymore and others on the Town Council as well as the Board of Education either leave or are voted out. If they are replaced with a majority of members of the Orthodox community, then there will most likely be attempts to divert funds from the school and town budgets in order to satisfy their own community's needs, as is

21

being done in Lakewood. Then you can say 'we' have lost our town. Until then, we haven't."

- "Exactly Look At Lakewood!! When I moved to lakewood in 1974 The Orthodox Jews were all basically Confined to the Northside of lake Carasaljo. The Rabbi had no intentions of expanding any further. Lakewood was supposed to be kept as a thouroghfare for teaching and then send them off to other communities. When he died 2 nephews saw an opportunity to expand. If you were to go to Israel in the center of town there is a huge banner hanging saying Please visit our little israel in lakewood NJ. They come in from Canada & michigan, . . . . One more reason for a NO to the Chabad variance."

- "We can't give an inch or they will take a mile. It starts with a few houses, which they will most likely rent out until the neighborhood "ownership" is more than 50 %. Then they will all move in and start their community. Demanding bussing (separate busses for boys and girls, busses on Sunday's and holidays, and until late into the evening). They do not get married legally (only religious ceremonies) so the women are technically "single mothers" with multiple children, receiving every subsidy/section 8 housing/ welfare etc (yes we are paying for that!!)"

- "They find loopholes, I swear there's a group of hasidics whose only job it is to find ways to cheat the system. Their marriages are not legal in the eyes of our laws so each wife collects a welfare check as if she was a single woman with a crap load of children."

- "Folks if this variance situation isn't solved very soon, it won't matter, because the Hasids will vote their own representatives into office and the usual Republican and Democratic politicians who either run the town now or are running for office will be on the outside holding their hands on their behinds..... Luckilly they don't have the numbers in toms river yet. Stop them. It's like the invasion of the bodysnatchers chairs."

- "Almost all of Lakewood the Jewish own. They inching there way all over toms river Manchester Howell . I think they got Jackson already."

- "Toms River should not ever be considered to be a ground for the jewish community to pour into now. Sorry stop producing like rabbits and maybe you wont have to be looking to pour into over towns, STAY IN LAKEWOOD!"

- "we don't need any cults that don't share the same Interest as the rest of the community ...period"

136. Toms River residents have been specifically warned on Facebook not to make anti-Semitic comments, with a member of the "Town Hall Stop the Sprawl!" Facebook noting that comments "had a clear anti-Semitic flavor to them. . . . The best way to maximize the likelihood

of defeat is let well intentioned comments turn anti-Semitic in tone.  Speak your mind, but stick strictly to a script."

137.   A Facebook "event" titled "Chabad Jewish Center Hearing" was created to mobilize the public to attend a Board hearing on the Chabad's application and to voice opposition to it.  The comments made on that page include, among many other similar statements:

- "They do not build a chabad onless [sic] they plan on infiltarting [sic] the neighborhood."

- "Your so called element is a cult and does nothing positive for the actual community and we foresee you guys doing the same thing out here in Toms river...I grew up in Lakewood from 1980 to 1997 I watched them invade many many peoples lives force people out of there homes by just being annoying and bullyish and because they found loop holes for tax breaks by saying its for religious reasons is a load of shit I have yet to see them be holy or even be an example of wat religion is suppose to be ...if there religion is buying up low income houses and putting people in the woods and then buying the woods so no one can live there and they haven't done anything with the land but no one that isn't a Jew can live in there smh....keep your asses in Lakewood"

- "Its about them getting away with things that every other non Hasidic Jewish citizen can't get away with! ITS UNFAIR and we the people of Toms River will try our very best to not allow them to come into our town and make it another Lakewood. They want to come into our town and not pay taxes when all of us hardworking citizens have to, not right and they get away with it. Do you know what they did to Lakewood? They have tons of kids, find ways to hide their actual income so they can get things they are not entitled to, they took all of the funding for Lakewood schools for their own profit, they abuse the system and they don't pay taxes!!!"

- "Not to mention that businesses go bankrupt because they only patronize Jewish establishments. Drain the healthcare system because they are all on state funded healthcare and welfare ride around with no insurance and don't maintain properties. The list is endless."

- "We just don't want toms river turning into Lakewood. None of us would move to Lakewood. Yourself included. If Lakewood was so glorious, why have you lived in TR for the past 45 years and not there?! Give us break. You even know what we are referring to."

- "Toms River should not ever be considered to be a ground for the jewish community to pour into now. Sorry stop producing like rabbits and maybe you wont have to be looking to pour into over towns, STAY IN LAKEWOOD!"

- "And not for nothing, someone who won't shake my hand and look me in the eye the first time I'm meeting them , I don't want to associate with. That's how I was raised 'culturally'"

- "Lakewood was a nice town until the Hasidic population took over."

- "Ocean county will be ran by thee Hasidics in 10 years."

- "So there is no correlation between the state of Lakewood and the hesidic Jew population accounting for 90% of their population?"

- "Just so no liberals get there panties in a bunch we are taking about the hesidic Jews which is a small sect of the Jew population."

- "Hasidics don't know how to be a good neighbor. So Franny if your outraged.....TOO FREAKEN BAD! AND SHAME OF YOU."

- "GET THEM OUT OF TOMSRIVER !!!!"

- "Keep THEM in Lakewood!!"

138.   Public comments to the press coverage of Plaintiffs' violations and variance

application include:

- "I'd say within 3-5 years the he-brews and she-brews will have 1-3 seats on the planning board. Then another. Then another. Then it's Lakewood #2."

- "NO NO NO.....THEY STOPPED THIS RELIGION IN OCEAN TOWNSHIP FROM BUILDING A DORM ON LOGAN ROAD IN A RESIDENTIAL AREA.....WE MUST STOP THEM HERE TOO!"

- "I hope the black hats didn't bribe the mayor with a girl with fake breasts...."

- "The orothodox jews have destroye Lakewood. All propertis are tax exempt because all properties are 'owned' by the Church. Do not permit the "church" to take over Toms River. If it is a business make them pay business taxes! Do not permit any Church group take over any town!"

- "Everyone has a freedom to practice their religion... However when it infringes on others rights and freedoms it has to be kept in check.  We have lost historic LAKEWOOD to traffic, accidents, slum lords, illegal basement apartments etc. we are losing the Rt 70 flea market to more housing developed by orthodox developers! It's a take over plan!! Toms river is an ocean front suburban town, open to all who want to assimilate and add to the community. The Jewish community does not want to assimilate! The Chabad is a corrupt scheme with investors buying up properties in and around that area. The Rabbi has a wife and children, living free!! Who pays

24

their expenses? For their food? For their healthcare??? For their maternity stays? The state does!! Someone needs to stop this or toms river will be bankrupt and look like a pigsty just like LAKEWOOD and all the local government will be taken over by a Jewish conspiracy."

- "So many news articles written these days regarding our frustration with Jewish corruption running amok in our state. Not paying taxes, hoarding our state's gold and political corruption. This story sounds vaguely familiar."

- "They have ruined Rockland County , NY pulling this same crap, Don't let it happen in Ocean County!!!!!!!"

- "ASSIMILATION is the key word here folks, they want to live here and have YOU and ME pay their share of the taxes and also pay for the social services they use; sounds to me like the start of a SANCTUARY CITY if these people succeed!"

- "Keep the wood out of toms river"

- "The Hasidim is a cult like subset of Judaism."

- "Disgusting phonies"

- "People talk about the Hispanics living in this country illegally -- maybe it's time to check the Orthodox as well."

- "Really lighten up, first of all you people do not, I repeat do not assiimilate into American society. Cant and Never will, your kids cant play with our kids, you cant come visit our homes, you share no hoildays we share as American, too many too list."

- "Can we ALL convert our homes to joo schools and avoid property taxes??"

- "I don't want them poisoning our town. They are a different breed."

- "I'll take the non-foreskin chewing corruption over these dirtbags any day."

139.   In a "letter to the editor" in a local newspaper, a Toms River resident wrote: "The application in Toms River should be declined.   Otherwise, Toms River could become an extension of Lakewood, . . . ."

140.   Local residents started two online petitions entitled "#Toms River Strong" and "#TomsRiverMatters" to oppose the Plaintiffs' variance application. Comments from residents on these petitions include:

- I think we all need to get pigs to put on our front lawns, in our back back yards...if you are zoned agricultural, residential & commercial like we are on New Hampshire Ave....get some pigs, that will keep them all away! ;) Say YES to pork! LOL

- Please don't let them destroy another town.

- Please stop this nonsense.  This offshoot cult of the Jewish faith will destroy this town.  Township officials need to stop worrying about being politically correct before Toms River looks like Lakewood.

- "Keep these damn jews out of Toms River.  There will be issues if this passes….I promise."

- "The Jewish population as is proof in Lakewood destroys a neighborhood."

- "Enough.  Keep them in Lakewood."

- "Keep THEM in Lakewood!! We don't need THEM taking over or town!!"

- "I want no part of them in Toms River!"

- "Please don't let them destroy another town."

- "Absolutely oppose this infiltration."

- "The last thing anyone needs is higher taxes to support the Jewish community who do not pay taxes! This will only cause more problems, more money more foreclosures for people who are tax exempt and don't have anything to do with our community**."**

- "The orthodox population in Lakewood has exploded to the point where there is no more room to house and educate the growing number of families that move there each year.  The Orthodox run the Township Committee, the Board of Education and the Zoning Board so they can circumvent any laws regarding placement of schools and houses of worship, which also will provide them with tax-exempt status.  Many of those families are on county assistance (because they are classified as 'students' who study at the Orthodox college in Lakewood) and receive Section 8 housing vouchers (provided to them by an association that is run by the Orthodox) and SNAP.  They are now trying to do the same thing in Jackson, Brick and Toms River.  If we allow this residence to become a 'house of worship', slowly but surely Toms River will turn into an expanded version of Lakewood.  If that happens, our taxes will skyrocket, our open space lands (that was paid for with our tax dollars) will be sold to developers for housing for Orthodox families, traffic will increase and our schools will go in the toilet.  This town will never be the same."

- "Toms River is where I grew up and I absolutely love it. I do not want to see my

home town get destroyed.. Keep the Jews out!"

- "Just NO ! Take a look at Lakewood and every others area they live and breed ! They will ruin toms river!"

- "If I'm labeled racist/AntiSemitic by banding together and doing the right thing, not wanting a parasite to destroy the future of our next generation, then so be it."

141.    Besides explicit anti-Semitic sentiments being published by Lakewood residents, other comments focus on the fact that certain ultra-Orthodox Jewish religious land uses are tax-exempt.  However, the Toms River community has not opposed other tax-exempt land uses within the Township on the same basis.

142.    Many Toms River residents placed lawn signs on their properties that state: "DON'T SELL! TOMS RIVER STRONG".  Such signs reflect anti-Semitic sentiment among the community as the intent is to prevent the ultra-Orthodox Jewish community from purchasing homes in Toms River.   Statements regarding the "DON'T SELL!" And "TOMS RIVER STRONG" phrases by local residents include:

- "We all know what would happen if they come in and takeover. Look at Lakewood. How about we standup for our quality of life!??? There are way more of us than them. This is OUR town. TR STRONG"

- "Will not allow them to take over TR. This is our town to build and enjoy. We will not let it be taken over. Do not let this go through. TR STRONG!"

- "Realize that if you don't sell, you will not allow the opportunity for our neighborhoods to change."

- "Yes, I heard a house in your neighborhood was recently sold to 'knockers'.....all I can say is talk to all of your neighbors and band together.....DON'T sell!!!"

- "I agree...if we don't sell to 'them' they'll have to go elsewhere.."

- "Don't let Toms River become part of Lakewood. Don't be sellouts and allow this to happen."

143.    The Township has recently adopted an anti-solicitation ordinance preventing any real estate canvassing in certain areas of the Township that border Lakewood.

144.    A substantial motivation for this ordinance is to prevent ultra-Orthodox Jews from

27

moving into Toms River.  This is confirmed by statements from the local community, which include:

- "The message from the meeting was abundantly and obnoxiously clear: no Jews in Toms River."

- "Town needs to expand their ban to all of TR. Sad that we have to fight to prevent hostile takeover of our own town."

- "This may seem too simple but maybe another solution is everyone band together and NOT sell to them. Dont go running just because one house gets sold. Thats what they want"

- "Good news for me is the house next to me doesn't fit the typical home for them. It's only 3BR and 1650sqft. Can't fit three families and 11 possible messiahs."

- "The problem now is they are buying empty lots"

- "Jackson, Toms River, Howell and Manchester will look just like Lakewood if you allow the current disease to spread....."

- "What they Do Lou Is once they secure a row of houses, they rope it off Go look at lakewood.. It is Called Eruv here is an article that may help clarify better then I can this is why they try to secure an entire block or cul-de sac . . . .  Everyone should read this. Very helpful in understanding the "opponent". Thanks for posting Carol Milin"

- "We are not moving, for many reasons, but I must be honest, it is really disturbing to have these people (yup, I wrote it again) yelling, screaming, being disruptive all hours of day and night, dirty, inconsiderate and literally all over the place."

- "I have spent a lot of time in Lakewood tutoring over the past ten years. They have completely taken over the town. There has to be something we can do to stop it from happening here. I don't know what but it will have to be big."

- "My husband and i have lived in silverton most of our lives.the change since the storm is unbelievable, the hasidics started buying property in silverton about 2 1/2 years ago and have places renters in their houses , needless to say it's changed silverton from that 'safe,desirable area' that we all miss. I hope we can all take a stand not just in North dover section ,but silverton and anywhere else in TR they are looking to take over."

- "If private individuals declare themselves religious teachers to avoid property taxes and wed their wives in religious and not civil courts so they can be considered single mothers and receive public assistance, if they only care about those of their religious persuasion and look down on everyone else, they would be condemned, but the Hasidics and those politicians who wish to earn their vote (take a look at the

votes controlled by them, and their unanimous nature) cry Anti-Semitism if any questions are raised. The public schools in Lakewood are being sucked dry by courtesy busing for the ever-increasing number of children in private schools and others in the town of Lakewood have neither representation nor relief from high taxes imposed because of the number of non-taxable properties. I decry ghettos of any sort, and am very sad to see the Lakewood sprawl increasing. Call me Anti-Semitic if you wish, or just call me a concerned human."

145.   Regarding the Township's restrictions on real estate canvassing, the Township's

Assistant Township Attorney, Anthony Merlino, wrote:

> "The constitutional questions involved make this a tricky issue to address legislatively. As you know, to the extent the groups engaged in these activities believe their constitutional freedoms of speech and religion are being infringed upon, they will not hesitate to redress those in court, and get a financial windfall in the process. That is why, in dealing with this situation, the Township must tread carefully.
>
>     . . . .
>
> Your complaints have not fallen on deaf ears. However, dealing with this situation is much like a chess game. Every action seems to be countered in one way or another. That is why it requires a <u>collaborative effort between concerned citizens and the governmental apparatus</u>."

(Emphasis added.)

146.   Specific Toms River residents with whom the Township's Assistant Township

Attorney has spoken or corresponded with in his "collaborative effort between concerned citizens

and the governmental apparatus" have made statements such as:

- "It's not about selling your home, <u>it's about to whom you choose to sell it that is the issue</u>." Let's also not be naive, and being mindful of 'hatespeak' here, there is a well planned long term goal of expansion out of Lakewood by its residents that we are trying to fight. Simply saying that we are trying to enforce local zoning regulations and code enforcement is disingenuous."  (Emphasis added.)

- "One important point that everyone needs to be very careful about what they say at the hearing. Because if the application is rejected and there is even the slightest bit of antireligiousness about the comments, that is giving the applicant a great reason to win on appeal. Comments like 'we don't need this in Toms River', 'we don't want this place to become Lakewood', 'see what has happened to Lakewood', etc… are very very bad. (<u>You are smart enough to couch your comments</u> in concerns about traffic flow, safety etc.. but there are A LOT of dumb emotional dopes who will say something.)"  (Emphasis added.)

- "Men and women are equal in this country but seems they are not in the Hasidic community."

- "Personally I think the 'Sunday school' is just a ploy to get a foot in the door. The next step would be to try for a regular/bigger school. We must think a head & outside the box as others do."

- "The harder we make it for people to over take our community the better they will give up if we fight as a town."

- "We had 'visitors' in Walden Woods this weekend so I believe it's going to happen however many of us have spoke. And if new neighbors don't like living there maybe others won't want to follow. IE outside parties and music on Friday nights and Saturdays."

- "The ultra Orthodox do not want to live amongst us. They do not want to see woman jogging in jogging outfits or people in bathing suits. If you DONT sell they can not buy. Please I know it's scary but please stay strong. Don't sell."

147.    Township employees have urged residents to place "no knock" stickers on their front doors which, under another recently passed Toms River ordinance, prohibits individuals from asking residents if their homes are for sale.

148.    The "no knock" ordinance was motivated by hostility toward the ultra-Orthodox Jewish population and a desire to prevent them from moving into Toms River.  Toms River residents do not want other residents to sell their homes to ultra-Orthodox Jews.

149.    The Township's active participation and encouragement of local residents not to permit members of the ultra-Orthodox community to approach them concerning real estate purchases indicated hostility against this community.

150.    The Township has therefore collaborated with and has been directly responsive to individuals motivated by hostility toward ultra-Orthodox Jews.


The Request for Interpretation to the Zoning Board of Adjustment

151.    On January 7, 2011, prior to the Chabad's closing on the purchase of the Property

at 2001 Church Road, an anonymous complainant describing themselves as a "Native of Toms River, NJ" submitted the following letter to the Township Zoning Officer in response to a notice on the Chabad's website about its prospective purchase of the Property:

> Dear Zoning Officer:
>
> The attached came to my attention and I wish to bring it to yours.
>
> Apparently, the local Chabad group is planning to build a Religious Center and residence on Church Road in Toms River.
>
> I do not know the exact location but you, perhaps, do. I wonder--
>
> Is the site that they are about to buy zoned for a religious center?
>
> Is it zoned for a residence as well?
>
> Can one facility serve both purposes in Toms River?
>
> I wish to remain anonymous in my asking these questions and thank you for understanding this wish.

152.    Mackle took no action against the Chabad and did not otherwise communicate with the Chabad or Gourarie about its proposed use after receipt of this notice.

153.    The Chabad did not close on the Property for more than two months after the Township received the anonymous complaint.

154.    If Mackle had issued a violation notice or otherwise communicated with the Chabad or Gourarie to state that the Chabad use was not permitted, the Plaintiffs would have had the opportunity to choose an alternate location or to challenge any use prohibition before it closed on the purchase of the Property.

155.    Also prior to purchasing the Property, Rabbi Gourarie went to the offices of the Township of Toms River's Department of Engineering, Construction Services, Code Enforcement and Community Development to inquire about the zoning status of the Property.

156.    A Township official consulted maps and other documents and informed Rabbi

Gourarie that his use would be permitted on the Property.

157.    Rabbi Gourarie was also informed by his attorney at the time that his use would be permitted on the Property.

158.    On April 11, 2011, after the Chabad had purchased the Property, Mackle, issued the following email to a Toms River employee named "Bob" based upon the incorrect statement of a Toms River resident:

> I called Mr. Vorrasi today.  He reports that a school operated by a religious organization has been established at the referenced site.  Would you please investigate, take photos and report your findings.

159.    Plaintiffs never operated a "school" out of the Property or any other property.

160.    Plaintiffs currently provide Hebrew classes to five children for two hours on Sundays.  This does not meet the definition of a "[p]ublic, parochial or private elementary or secondary school" as defined in the Code.

161.    On May 2, 2011, Toms River resident Don Bonaca issued the following written complaint to the Township:

> A private religious school is operating out of the sigal [sic] family dwelling that is on the property.  It is next to the VWF Post on Church Road.

162.    On May 5, 2011, Mackle issued a violation notice for "Establishing a non-residential use without permits" and "Failure to obtain permit for sign."

163.    In response to Mackle's notice, Chabad removed its proposed sign.

164.    Rabbi Gourarie contacted Mackle after receiving the notice and explained to him that the Property was his residence, that he kept his office there, and that he hosted various gatherings at the Property, which Mackle was aware were related to the Chabad.

165.    The Township took no further action in 2011 regarding the "establishing a non-residential use" violation notice, by Mackle or anyone else.

166.    In the summer of 2011, the Township's Fire Marshal inspected the exterior of the property and stated that he knew about the Chabad's activities at the prior location of the Chabad house.

167.    The Township took no further action in 2011 after the Fire Marshal's visit in the summer of 2011.

168.    In 2012, the Chabad filed the Initial Statement of Organization Claiming Property Exempt Status seeking exemption from municipal real estate taxes as a religious organization designated as a clergy's dwelling.

169.    The Township stated that it "lost" the Chabad's application for tax exemption.

170.    In 2013, the Chabad applied again for a property tax exemption for 2014.

171.    The Township granted the Chabad's second application for property tax exemption.

172.    The Chabad appealed the tax assessment on the Property for 2013 to the Tax Court of New Jersey in *Chabad Jewish Center of Toms River v. Toms River Township*, Docket No. 010867-2013.

173.    A stipulation of Settlement was executed by the Township and the Chabad on May 6, 2014 and May 7, 2014 by which the Chabad was granted a refund of a portion of 2013 taxes.

174.    On August 26, 2014, the court-ordered refund of $3,050.00 was paid to the Chabad.

175.    On December 29, 2014, only a few months after the Chabad prevailed on its tax appeal and received its refund, Mackle issued eight municipal violation tickets against the Plaintiffs as follows:

> a.    Ticket number 1507-SC-009742; Chabad Jewish Center; Bernard M. Mackle, zoning officer; Establishing A Use (Chabad) Not Permitted In Zoning District (Block 394, Lot 17); Code 348-10.3A; dated 10/29/2014.
>
> b.    Ticket number 1507-SC-009744; Chabad Jewish Center; Bernard M. Mackle, zoning officer; Failure To Obtain Site Plan Approval (Block

394, Lot 17); Code 348-6.1D; dated 10/29/2014.

c.  Ticket number 1507-SC-009746; Chabad Jewish Center; Bernard M. Mackle, zoning officer; Failure To Obtain A Development Permit (Block 394, Lot 17); Code No. 348 6.2A(4); dated 10/29/2014.

d.  Ticket number 1501-SC-009748; Chabad Jewish Center; Bernard M. Mackle, zoning officer; Establishing A Use (Chabad) Not Permitted In Zoning District (Block 394, Lot 17); Code No. 348-5.2; dated 10/29/2014.

e.  Ticket number 1507-SC-009743; Moshe Gourarie; Bernard M. Mackle, zoning officer; Establishing A Use (Chabad) Not Permitted In Zoning District (Block 394, Lot 17); Code 348 10.3A; dated 10/29/14.

f.  Ticket number 1507-SC-009745; Moshe Gourarie; Bernard M. Mackle, zoning officer; Failure To Obtain Site Plan Approval (Block 394, Lot 17); Code 348 61D; dated 10/29/14.

g.  Ticket No. 1507-SC-009747; Moshe Gourarie; Bernard M. Mackle, zoning officer; Failure To Obtain Development Permit (Block 394, Lot 17); Code 348 6.2A(4); dated 10/29/14.

h.  Ticket No. 1507-SC-009749; Moshe Gourarie; Bernard M. Mackle, zoning officer; Establishing A Use (Chabad) Not Permitted In Zone District (Block 394, Lot 17); Code 348 5.2; dated 10/29/14.

176.  These tickets were not preceded by any change in the operations of the Chabad.

177.  There is no land use described as a "Chabad" in the Township's Code.

178.  On January 22, 2015, the attorney for the Chabad and Gourarie sent a letter to Mackle requesting a determination that the use of the Chabad is permitted and requesting that the eight tickets be dismissed.

179.  Mackle never responded to the request for the Zoning Officer's determination. Instead, Garry Mundy, Assistant Township Attorney, issued an email stating that the Chabad needed to obtain a special reasons variance.

180.  The Chabad filed an application with the Board on or about May 8, 2015 seeking the following relief:  (1) An interpretation that no use variance is required for the use of the

Property by the Chabad and Gourarie pursuant to N.J.S.A. 40:55D-70b and Section 348-3.2(j)(2) of the Land Use and Development Regulations of Toms River; (2) in the event the Board took the erroneous position that a use variance was required, the Chabad sought said use variance; and (3) waiver of the requirement for site plan on the grounds that no changes were proposed to or required for the Property in connection with the Chabad's continued use.

181.    The application sought no additional improvement to the Property in terms of new construction, and would utilize an existing parking area and existing utility connections.

182.    Under New Jersey state law, a clergy residence or parsonage is permitted to be used for small weekly religious gatherings.

183.    In *State v. Cameron*, 100 N.J. 586 (1985), the New Jersey Supreme Court held that an Episcopal minister could not be prevented from holding weekly religious gatherings of 25 participants in his home, which was located in a zoning district that excluded churches.

184.    In *Farhi v. Commissioners of Deal*, 204 N.J. Super. 575 (1985), another New Jersey court held that a zoning ordinance that is enforced to prevent the gathering of religious worshipers in a private residence violates the free exercise of religion guaranty under the State's Constitution.

185.    The Chabad's application was "unofficially" deemed complete by email from Colleen McGurk, PP/AICP and Assistant Zoning Officer ("McGurk") on July 28, 2015.

186.    The Chabad's application was officially deemed complete on August 7, 2015.

187.    On August 19, 2015 and on December 8, 2015, McGurk issued nearly identical professional review memoranda to the Board.  Both memos stated that: "The applicant is requesting to legitimize an existing use on the property. The use consists of a residential structure being utilized for religious and educational purposes."

188.    Importantly, both memoranda from McGurk stated: "Weekly religious services for

15 people <u>does not fit the definition of a house of worship</u> and therefore <u>the religious services being held are not part of the Use Variance</u>."  (Emphases added.)

189.    McGurk's memoranda were based on controlling New Jersey law permitting such use of a residential property.

190.    At the Board hearing, McGurk stated that her conclusion was "based on case law, State versus Cameron."

191.    McGurk also stated that the "weekly Chabad services" were "[s]imilar to the State versus Cameron case. . . .  Where it was deemed as single-family use with ancillary services."

192.    Thus, the Township admitted that the Chabad's weekly religious services were permitted as part of the existing residential use of the Property.

193.    On July 24, 2015, Douglas F. Klee, P.E., P.P., C.M.E. of Owen, Little & Associates, also issued a memorandum as the Zoning Board Engineer.

194.    The first hearing was held at the Toms River Municipal Building on October 22, 2015.

195.    The Board incorrectly described the Chabad's application as follows:

> The applicant seeks Use Variance and Minor Site Plan approval so as to establish a <u>school facility</u> as an additional use within the existing single family dwelling. The proposal provides no additional site improvements and will utilize an existing residential driveway, an existing 10 stall off street parking area and existing utilities connection to accommodate the additional use which is proposed.

(Emphasis added.)  Such false statement was made in the Board's October 22, 2015 Agenda.

196.    The Chabad never applied to establish a "school facility."

197.    Due to the high level of public objection to the Chabad's application--created in part by the Township's mislabeling of the use as a "school"--and the inability to accommodate the public into the municipal meeting space, the the October 22 meeting was limited to procedural

decisions and the substantive application did not commence.

198.    At the October 22 hearing, the Board determined: (1) the hearing would be divided into two distinct phases: First, an interpretation of ordinance to determine if a use variance is required; and second, if a use variance is required, the use variance would be heard as a separate second phase; and (2) the first hearing would be held on December 17, 2015 at the Toms River North High School.

199.    Defendants attempted to thwart the Chabad's application by mislabeling its use as a "school," which is not permitted in the R/C-3 zoning district.

200.    The Defendants' attempt to mislabel the Chabad's use as a "school" was knowingly responsive to the anti-Semitic hostility of the local community, which had publicly made such false claims.

201.    At the Board's October 22, 2015 hearing, the Chabad's attorney expressly stated that the Chabad was not proposing a school and that the reference to the Chabad opening a school should be removed from the agenda and other Township and Board publications.  The Board determined that the "school" question was a factual question and refused to correct its agenda and other Township written materials.

202.    The Township received numerous letters and emails from the local community opposing the Chabad's application.

203.    Toms River's Township Attorney Ken Fitzsimmons took the extremely unusual step of urging residents to attend the Chabad's land use hearing before the Board in a publication on the official website of Toms River.

204.    Fitzsimmons wrote to Toms River residents: "Your comment and opinion is important to this proceeding.  We urge you to appear at the October 22nd meeting."

205.     Upon information and belief, Fitzsimmons has not urged residents to attend other Zoning Board hearings.

206.     At the time of his statement, Fitzsimmons was aware of the significant anti-Semitic hostility in the Toms River community, and that the Board had already determined that the application would not proceed at that hearing and the only purpose of the hearing was for scheduling purposes.

207.     Mayor Kelaher also urged residents to contact the Board and attend the December 17, 2015 hearing on the Chabad's application.

208.     Mayor Kelaher was aware of the hostility that such residents had to the ultra-Orthodox community.

209.     Various "mailers" were sent out by community members opposed to the use.

210.     Board members had received such "mailers" concerning opposition to the Chabad's use.

211.     On December 17, 2015, the Defendant Board held its hearing on the interpretation request by the Plaintiffs.

212.     There were over 1,200 people in attendance at the Board's hearing, the great majority of whom were opposed to the Chabad's application.

213.     At the Board's hearing, the Chabad's attorney and Gourarie described the use of the Property, which included weekly prayer services for approximately fifteen people, Hebrew school for two hours on Sundays for five children, dinners with the Gourarie family, and other small functions.  Larger functions were held off-site.

214.     Plaintiffs indicated to the Board that they would be willing to hold any of the current religious gatherings off-site so as to comply with the Code's requirements.

215.    The Chabad's attorney explained that the Plaintiffs' use was not a "school."

216.    Substantial opposition that was raised by the Toms River community at the December 17 hearing was motivated by hostility and animus toward the ultra-Orthodox Jewish community.

217.    The crowd at the Board hearing frequently applauded objectors and yelled out comments.

218.    The Board's hearing was described in the local media as "rowdy," and "many others opposed [the request], and loudly made their opposition known throughout the meeting, shouting down people" who "were there to support Gourarie's request, . . . ."  Also reported was that "[s]everal times residents got testy, shouting at the board," and that "the anger simmered in the room all night, . . . ."

219.    During the zoning board hearing, Rabbi Gourarie was targeted with shouting, "booing" and insults.

220.    At one point during the zoning board hearing, a resident shouted out, calling the Rabbi a "weasel."

221.    Another member of the crowd shouted "liar, liar, pants on fire!" at Rabbi Gourarie.

222.    Many objectors who testified at the hearing addressed the issue of the Chabad's tax exemption, which is wholly irrelevant to the zoning proceedings before the Board.

223.    The Board did not prevent the repeated questioning concerning the Chabad's tax exemption, even after objection by the Chabad's attorney.

224.    Other objectors asked irrelevant questions about issues such as Rabbi Gourarie's sources of employment, fundraising for the Chabad, and enforcement actions.

225.    Another objector asked Rabbi Gourarie if he would turn anyone away who wanted

to "learn about the Jewish religion," and after the Rabbi stated that everyone is welcome, she rallied the crowd to bring 1,000 people to the Chabad in order to force it to move to a different location, shouting: "Who would be willing to show up on the First Friday of every month?" to the crowd.

226.    Another objector accused the Chabad of operating a "business" at the Property.

227.    Another objector stated: "Based on some of the noise that's been in the audience lately, this meeting, there seems to be . . . a question about your honesty and sincerity."

228.    Other objectors raised the issue of nearby Lakewood Township, which has a substantial ultra-Orthodox Jewish population.

229.    An objector asked Rabbi Gourarie: "Rabbi, do you know how many private schools currently exist in Lakewood? . . . .   Rabbi, do you know how many tax exempt faith-affiliated schools there are in Lakewood, New Jersey? . . . .  Rabbi, do you know what the school budget for transportation is in Lakewood High School?"

230.    Another objector asked Rabbi Gourarie: "would you be able to tell me if you have any -- any connection to Lakewood at all?"

231.    Another objector falsely accused Rabbi Gourarie of "trying to revoke the liquor license for the American Legion."

232.    Another objector asked Rabbi Gourarie: "Did you take any kind of oath to be a rabbi"?

233.    Such cross examination by Township residents was motivated by hostility toward the Chabad's religious faith.

234.    No objectors testified that there were any actual negative land use impacts created by the Plaintiffs' continued use.

40

235.   During cross examination of Gourarie, the attorney for several objectors, Edward Liston, Esq., did not raise any actual negative land use impacts created by Plaintiffs' continued use.

236.   Speakers at the Board meeting published online statements such as:

- "Realize that if you don't sell, you will not allow the opportunity for our neighborhoods to change. Here is a website that explains the concept of an 'eruv' This is essentially a contained neighborhood of sorts….. has to do with judaism and religious beliefs."

- "food for thought: Lakewood: 350 Orthodox properties tax-exempt"

- Referring to ultra-Orthodox Jews moving into Toms River: "That is really bad news. Everyone needs to hold out in this area. We have not been infiltrated there."

237.   Board Member Robert Alston, who made the motion that was eventually approved denying the requested use of the single-family dwelling as a clergy residence, admitted: "I doubt it's a school based on the size of the classes that are there."

238.   The Board members all voted in favor of the motion made by Alston, with one abstention, to deny the Plaintiffs' request for interpretation that its clergy residence use was permitted on the Property.

239.   On January 28, 2016, the Board adopted its Resolution memorializing the vote against Plaintiffs' request, stating in relevant part:

> NOW THEREFORE BE IT RESOLVED, the Toms River Board of Adjustment in a unanimous vote has decided against the applicant's request to overturn the zoning officer's decision and rejects the applicant's contention that in fact the site is utilized solely for prayer services.  In fact, the Board specifically finds the activities admitted by the applicant's representative, and testified to by the applicant, which includes utilizing the premises for the Rabbi's home, as the leader of the Chabad Jewish Center, utilization for various services, and as an instructional school for Hebrew and Jewish History classes.  The Board finds the utilization of the premises for the stated activities brings the premises to a level of a house of worship, and such activity would require a use variance in the designated zone of the applicant's property, which does not allow for houses of worship.

> NOW, THEREFORE, in addition to the factual finds [sic] set forth above, the Township of Toms River Township Board of Adjustment disagrees and finds that the premises is being utilized for more than a casual prayer group, as submitted under case law cited. The Board specifically finds that a use variance and site approval would be required in that the Board finds that the Property is being utilized as a House of Worship along with other related activities.

240.    The Board therefore determined that the Chabad's use was a "place of worship" and not a clergy residence, directly contrary to State law and its own professional's opinions, and despite the fact that it was undisputed that the single-family residence was the principal use of the Property and dwelling.

241.    The Board also determined that that the Chabad's use included a "school," contrary to its own ordinance, to the zoning board member who made the motion, and contrary to the undisputed testimony that the Rabbi instructed only five young children for a couple hours on Sundays.

242.    The Board determined that only a "casual prayer group" would be permitted, contrary to New Jersey state case law which addresses ongoing regular worship services.

243.    The Board was unwilling to permit the Chabad's use under <u>any</u> conditions, regardless of the number of events or participants.

244.    The Chabad was willing to hold any events above a certain size--to be determined by the Board--regardless of how infrequent, at a separate location.

245.    Rabbi Gourarie repeatedly informed the Board that if, as part of its interpretation, the Chabad was required to move any larger celebration events or speaker events off of the Property in order to retain its status as a residence, it would do so.

246.    During the Board's hearing the Chabad discussed the possibility of "adjust[ing] its activities to fit within the parameters of this town's ordinance."

247.    The Board was informed of its obligations under federal law to decide the Chabad's

application in a manner that did not violate RLUIPA.

248.    The Board had the authority to place limits on the Chabad's use, as its chairperson stated: "MS. STEFANIK:  In the end any approval if it's necessary would be granted.  Everything would be stated.  It would be spelled out.  The limits would be listed in the approval and that would have to be adhered to."  (Emphasis added.)

249.    By failing to approve the Chabad's request for interpretation, the Board substantially burdened the Plaintiffs' religious exercise.

250.    By failing to approve the Chabad's request for interpretation, with or without conditions limiting its use, the Board failed to use the least restrictive means of achieving any governmental interest.

251.    In denying the Plaintiffs' request for interpretation, contrary to State law, the opinion of its Zoning Officer, and the willingness of the Chabad to be limited to whatever activity the Board deemed permissible as a clergy residence, the Board was substantially motivated by animus against ultra-Orthodox Jews.

252.    In denying the Plaintiffs' request for interpretation, the Board was responsive to the objecting local community, which was substantially motivated by anti-Semitic animus.

253.    The Board's Resolution was published on February 10, 2016

254.    Under State law, Plaintiffs are required to appeal the Board's decision within 45 days of publication of the Resolution, or they waive such right to do so.  Rule 4:69-6 of the New Jersey Court Rules states:

> No action in lieu of prerogative writs shall be commenced . . . (3) to review a determination of a planning board or board of adjustment, or a resolution by the governing body or board of public works of a municipality approving or disapproving a recommendation made by the planning board or board of adjustment, after 45 days from the publication of a notice once in the official newspaper of the municipality or a newspaper of general circulation in the

municipality, provided, however, that if the determination or resolution results in a denial or modification of an application, after 45 days from the publication of the notice or the mailing of the notice to the applicant, whichever is later. The notice shall state the name of the applicant, the location of the property and in brief the nature of the application and the effect of the determination or resolution (e.g., "Variance-Store in residential zone denied"), and shall advise that the determination or resolution has been filed in the office of the board or the municipal clerk and is available for inspection; . . . .

255.    The Board's decision was a final decision and was not reviewable by any other administrative agency.

256.    In denying the Plaintiffs' request for an interpretation allowing them to continue engaging in the same religious exercise they have engage in at the Property and the prior residential location in Toms River for twelve years, the Board was knowingly responsive to the anti-Semitic animus of the local community.

257.    The day after the Board hearing, the Township Construction Official, Ken Anderson ("Anderson"), issued two municipal violations notices against the Chabad as follows:

a.    Notice of Violation and Order to Terminate, Violation No. V☐15☐00376.  In relevant part, that Violation provided:

"Take notice that you have been found in violation of the State Uniform Construction Code Act and regulations promulgated thereunder in that: OPERATING AN ASSEMBLY USE WITHIN AN R5 STRUCTURE; IMMEDIATELY CEASE AND DESIST ANY AND ALL ASSEMBLY USES INCLUDING RELIGIOUS SERVICES AND/OR EDUCATIONAL CLASSES."

b.    Notice and Order of Penalty, Violation No. V☐15☐00375.  In relevant part, that Violation provided:

"Based on recent sworn testimony at a public hearing:  1) garage alteration performed without a permit.  Violation of NJAC 5:23☐2.14(a). $2,000.00 penalty issued.  2) Assembly Use Group activities occurred in violation of R5 use group certificate of occupancy.  NJAC 5:23☐2.31(b)4.  Additional $2,000.00 penalty issued.

On 12/18/2015, you were found to be in violation of the State Uniform

Construction Code Act and regulations promulgated thereunder, in that you… [X] Failed to obtain a construction permit; and… [X] allowed occupancy prior to receiving a certificate of occupancy."

258.    No alterations have been made to the garage that would necessitate a permit.

259.    Township officials refused to return numerous call from Plaintiffs' attorney concerning the "violations."

260.    The Township delayed service of the two notices until December 23, 2015.

261.    On January 5, 2016, the Chabad filed an appeal of the violations with the Ocean County Construction Board of Appeals ("County Board") on the ground that they do not set forth violations that have been committed by the Chabad.

262.    The violations were issued by Ken Anderson to appease the objectors who complained at the hearing about the continued operation of the Chabad.

263.    After the Chabad filed its appeal, the County Board scheduled a public hearing on March 3, 2016.

264.    On February 26, 2016, prior to the March 3 hearing, the attorney for the County Board adjourned the March 3, 2016 hearing "until all zoning issues are resolved."

265.    The forced adjournment of the County Board hearing has deprived the applicant of its remedy to appeal the two wrongful municipal violations issued by Anderson.

266.    Applicants before the Board who were not ultra-Orthodox Jews have not been subjected to such hostility.

267.    Because of the Board's decision rejecting Plaintiffs' request for interpretation, Plaintiffs' use is not permitted anywhere within the Township.

268.    The Board has deemed Plaintiffs' use a "house of worship"; however, the "primary or principal use" of the Property is "single-family residence" under the Code because the

residential use of the Property is the "primary or principal purpose for which [the] building, structure or lot is used."

269.    Furthermore, the Township's Code states that "[i]n any district, any <u>dwelling</u> shall be deemed to be a principal building on the lot on which it is located"  and because "any initial structure constructed upon a parcel of land or a building containing <u>living space</u> shall never be considered an 'accessory building.'"  (Emphasis added.)  Thus, the clergy residence is both the principal building and principal use of the Property.

270.    The Township confirmed this, as Colleen McGurk stated "[t]he primary use is that of a single-family residence which is permitted in the R/C 3 zoning district."

271.    A "church" or "house of worship" is not permitted as an accessory use to a "single-family dwelling" under section 348-10.3(C) of the Code.

272.    A "church" or "house of worship" would not be permitted as an accessory use to a "single-family dwelling" anywhere within the Township.

273.    Thus, the Plaintiffs' proposed use would not be permitted as a "church" or "house of worship" on the Property, even with a use variance.

274.    Even if the Plaintiffs' use did not include the single-family residence and was correctly deemed a "church" or "school," the Chabad would have to obtain a "use variance" to operate whatever combination of "church," "school" and/or other use(s) that the Defendants believe describes the Chabad's use.

275.    Any attempt to obtain a use variance would entail great uncertainty, delay and expense and due to the hostility of the objectors.

276.    A use variance application involves multiple factual and professional witnesses during which the objectors will be given the opportunity to delay the proceedings and continue to

harass Gourarie and the other Chabad witnesses.

277.    Furthermore, the Township would be able to continue to take wrongful actions, such as the issuance of Anderson's code violation, during the course of the application.

278.    In order to prevail on the use variance application, the Chabad would need to satisfy the requirement of N.J.S.A. 40:55D-70d and show "special reasons" for the granting of the application to satisfy the positive criteria by proving that it is an inherently beneficial use and would need to show that the variance relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and the zoning ordinance.  Such extensive proofs are unwarranted for the Chabad's continued permitted use.

279.    Given Plaintiffs' limited budget, the Chabad cannot afford to hire the typical professionals required to apply for a use variance.

280.    It is unreasonable to require Plaintiffs to apply for a variance for a land use or uses that do not correctly describe their use.

281.    Plaintiffs do not seek to operate a "church" or "school" but rather a clergy residence.

282.    Based on various communications with the Township, advice from counsel, and controlling state law, Plaintiffs had a reasonable expectation that their use would be permitted on the Property.

283.    The Board's denial of the Chabad's request for interpretation severely impedes and prevents Plaintiffs' exercise of its religion.

284.    The Board's denial of the Chabad's request for interpretation took place within a system of formal procedures that permitted the Board to make individualized assessments for the uses for the property involved.

285.    The Chabad's operation affects interstate commerce by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of New Jersey; the use of means of interstate communication to facilitate the Chabad's ongoing operations; the use of interstate travel related to the Chabad's ongoing operations; and the purchase of goods and services related to the Chabad's ongoing operations and maintenance.

286.    The Defendants' actions described above all took place under color of state law.

287.    The Board was informed of the applicability of RLUIPA to its actions.

288.    The harm to the Chabad caused by the Defendants' laws and actions, which prevent it from using the Property to accommodate its religious needs, is immediate and severe.

289.    Plaintiffs have cancelled religious gatherings, and have not scheduled other religious gatherings, because of the Defendants' actions.

290.    Donors to the Chabad have complained that they were targeted by other people for supporting the Chabad.

291.    The Plaintiffs have no other location from which it can engage in weekly religious services and other activities that currently take place at the Property.

292.    Defendants' laws and actions imminently threaten to substantially burden the Plaintiffs' free exercise of religion.

293.    There are no quick, reliable and viable alternative options for the Chabad's operations.

294.    The Chabad has no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

295.    The Plaintiffs have also suffered significant financial damages as a result of the

Defendants' laws and their application to the Chabad.

## COUNT I

### Violation of Religious Land Use and Institutionalized Persons Act of 2000 – "Substantial Burdens" 42  U.S.C. § 2000cc(a)

296.    Paragraphs 1 through 295 are incorporated by reference as if set forth fully herein.

297.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that places substantial burden on the Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest.

## COUNT II

### Violation of Religious Land Use and Institutionalized Persons Act of 2000 – "Nondiscrimination" 42 U.S.C. § 2000cc(b)(2)

298.    Paragraphs 1 through 297 are incorporated by reference as if set forth fully herein.

299.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that discriminates against them on the basis of religion and religious denomination.

## COUNT III

### Violation of Religious Land Use and Institutionalized Persons Act of 2000 — "Equal terms" 42 U.S.C. § 2000cc(b)(1)

300.    Paragraphs 1 through 299 are incorporated by reference as if fully set forth herein.

301.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that religious land uses them on terms that are less than equal to nonreligious assembly and institutional land uses.

## COUNT IV

### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 — "Exclusion and Limits": Total Exclusion
### 42 U.S.C. § 2000cc(b)(3)(A)

302.    Paragraphs 1 through 301 are incorporated by reference as if set forth fully herein.

303.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that totally excludes their religious assembly from within the jurisdiction.

## COUNT V

### Violation of the Fair Housing Act
### 42 U.S.C. § 3604

304.    Paragraphs 1 through 303 are incorporated by reference as if set forth fully herein.

305.    The Defendants have intentionally discriminated against the Plaintiffs by making housing "unavailable" within Toms River because of religion in violation of 42 U.S.C. § 3604(a).

306.    Defendants' land use regulations have had the effect and continue to have the effect, whether intended or not, of excluding Plaintiffs from obtaining housing within Toms River by

discriminating against the Plaintiffs based on religion, in violation of 42 U.S.C. § 3604(a).

307.    Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i) and they have suffered harm, damage and injury as a result of Defendants' conduct.

## COUNT VI

### United States Constitution
### Violation of 42 U.S.C. § 1983: First Amendment
### Free Exercise of Religion

308.    Paragraphs 1 through 307 are incorporated by reference as if set forth fully herein.

309.    Defendants have deprived and continue to deprive the Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by substantially burdening their religious exercise without using the least restrictive means of achieving a compelling governmental interest, and by discriminating against them on the basis of religion in a manner that is not the least restrictive means of achieving a compelling governmental interest.

## COUNT VII

### United States Constitution
### Violation of 42 U.S.C. § 1983: Fourteenth Amendment
### Equal Protection

310.    Paragraphs 1 through 309 are incorporated by reference as if set forth fully herein.

311.    Defendants have deprived and continue to deprive the Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against them in the imposition and implementation of their land use regulations.

## COUNT VIII

**Action in lieu of prerogative writ**
**New Jersey Municipal Land Use Law**
**N.J.S.A. § 40:55D-1 *et seq.***

312.    Paragraphs 1 through 311 are incorporated by reference as if set forth fully herein.

313.    The actions of the Board were arbitrary, capricious, unreasonable and contrary to law.  The Board of Adjustment abused its discretionary authority in its interpretation of whether New Jersey law permits the Chabad's continued use of the Property without the necessity of a use variance.

314.    The applied-for use of the Subject Property as a religious institution is inherently beneficial.

315.    The Board failed to properly consider and interpret the New Jersey case law, including *State v. Cameron*, 100 N.J. 586 (1985); *Fahri v. Commissioners of Deal*, 204 N.J. Super. 575 (Law Div. 1985); and *Chabad of Randolph, Inc. v. Twp. of Randolph*, 2008 N.J. Super. Unpub. LEXIS 573, 2008 WL 5411971 (App. Div. Dec. 31, 2008), which set forth the Chabad's right to continue its use of the Property without obtaining a use variance.

316.    The Board did not follow the professional advice of its planning professional, McGurk, wherein she stated in her memos of August 19, 2015 and December 8, 2015 that "Weekly religious services for 15 people does not fit the definition of a house of worship and therefore the religious services being held are not part of the Use Variance."

317.    The Board failed to determine what aspect of the Chabad's use created the necessity for a use variance for the Chabad's continued use.

318.    The Board failed to consider the Chabad's offer to change its operations to eliminate activities, if any, that would necessitate a use variance.

319.    The decisions of Board were based on conclusions contrary to the weight of the evidence adduced at public hearings and the Board failed to place its reasons for the denial on the record.

320.    The Plaintiffs' interests have been adversely affected and manifest injustice created by the Board of Adjustment's arbitrary, capricious and unreasonable application of their planning, zoning and land use powers.

## COUNT IX

### Violation of the New Jersey Law Against Discrimination,
### N.J. Stat. Ann. § 10:5-12.5

321.    Paragraphs 1 through 320 are incorporated by reference as if set forth fully herein.

322.    By denying Plaintiffs, on the basis of religion, the opportunity to obtain the accommodations, advantages, facilities, and privileges of ownership of real property, Defendants violated and continue to violate their rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

323.    Defendants' conduct has caused significant damage to Plaintiffs.

324.    Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## COUNT X

### New Jersey Constitution
### Violation of Art. 1 ¶¶ 1, 3

325.    Paragraphs 1 through 324 are incorporated by reference as if set forth fully herein.

326.    Defendants have deprived and continue to deprive the Plaintiffs of their rights, as secured by paragraphs 1 and 3 of the New Jersey Constitution, to "worship[] Almighty G[-]d in a

manner agreeable to the dictates of [their] own conscience," and to be free from laws that are unconstitutionally vague as applied to Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, the CHABAD JEWISH CENTER OF TOMS RIVER INC. and RABBI MOSHE GOURARIE respectfully requests that this Court grant the following relief:

1. A declaration that the Township of Toms River's land use ordinances, to the extent that they substantially burden, exclude, unreasonably regulate, and discriminate against the Plaintiffs' land use, are void, invalid and unconstitutional on their face and as applied to the Plaintiffs on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, the New Jersey Law Against Discrimination, and the New Jersey Constitution, Article 1 ¶¶ 1, 3;

2. A declaration that the denial of the Plaintiffs' request for interpretation to permit it to continue using the Property for purposes of religious exercise is void, invalid and unconstitutional on the ground that it violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, the New Jersey Law Against Discrimination, and the New Jersey Constitution, Article 1 ¶¶ 1, 3;

3. An order reversing the decision of the Toms River Township Zoning Board of Adjustment and an order declaring that the Plaintiffs' request for interpretation to continue using the Property for purposes of religious exercise is hereby approved;

4. An order directing the Toms River Township Zoning Board of Adjustment to reverse its denial of the Plaintiffs' request for interpretation and approve the request to permit the Plaintiffs' continued use of the Property for purposes of religious exercise as applied for;

5. Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors  and all others acting in concert with them from applying their laws in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, the New Jersey Law Against Discrimination, and the New Jersey Constitution, Article 1 ¶¶ 1, 3, or undertaking any and all action in furtherance of these acts;

6.      An award of compensatory damages against Defendants in favor of the Plaintiffs as the Court deems just for the loss of its rights under the First and Fourteenth Amendments to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, and the New Jersey Law Against Discrimination incurred by the Plaintiffs and caused by the Defendants' laws and actions;

7.      An award to the Plaintiffs of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

8.      Such other and further relief as this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action on all issues so triable.

Respectfully submitted by the Plaintiffs this 22st day of March, 2016.

**KENNY CHASE & COSTA**
By: _/s/ Christopher K. Costa_
Christopher K. Costa
3812 Quakerbridge Road
Hamilton, N.J. 08619
Phone: (609) 588-9800 x.26
Fax: (609) 588-0588

**STORZER & GREENE, P.L.L.C.**
Sieglinde K. Rath
Roman P. Storzer, application for admission
        _pro hac vice_ pending
Robert L. Greene, application for admission
        _pro hac vice_ pending
1025 Connecticut Ave., N.W. Suite 1000
Washington, D.C. 20036
Tel: 202.857.9766
Fax: 202.315.3996

_Attorneys for Plaintiffs_

## CERTIFICATION

Pursuant to <u>R</u>. 4:69-4 of the New Jersey Court Rules, I hereby certify that all transcripts have been ordered and will be filed with the Court after the matter has been assigned a judge for total handling.

**KENNY CHASE & COSTA**
By: <u>/s/ Christopher K. Costa</u>
Christopher K. Costa
3812 Quakerbridge Road
Hamilton, N.J. 08619
Phone: (609) 588-9800 x.26
Fax: (609) 588-0588

*Attorney for Plaintiffs*

## CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding and that no such action, arbitration or administrative proceeding is contemplated at this time.  I do not know of any other party who should be joined in this action.

**KENNY CHASE & COSTA**
By: <u>/s/ Christopher K. Costa</u>
Christopher K. Costa
3812 Quakerbridge Road
Hamilton, N.J. 08619
Phone: (609) 588-9800 x.26
Fax: (609) 588-0588

*Attorney for Plaintiffs*